# IN THE UNITED STATES COURT OF APPEALS
## FOR THE FIFTH CIRCUIT

United States Court of Appeals
Fifth Circuit

**F I L E D**

January 27, 2014

No. 10-11035

Lyle W. Cayce
Clerk

Tigist Ryals

Plaintiff-Appellant

v.

American Airlines, Inc.

Defendant-Appellee

Appeal from the United States District Court
for the Northern District of Texas
USDC No. 4:08-CV-460

Before KING, GARZA, and GRAVES, Circuit Judges.

PER CURIAM:[*]

Tigist Ryals appeals the district court's grant of summary judgment for American Airlines in her employment discrimination case. Finding that the district court correctly found that no genuine issue of material fact remained for trial and that judgment was proper as a matter of law, we affirm.

## FACTS AND PROCEDURAL HISTORY

Tigist Ryals filed an action for employment discrimination, on the basis of race, national origin, sex and retaliation, against American Airlines (AA) in the

---

[*] Pursuant to 5TH CIR. R. 47.5, the court has determined that this opinion should not be published and is not precedent except under the limited circumstances set forth in 5TH CIR. R. 47.5.4.

No. 10-11035

Northern District of Texas, Fort Worth Division, on August 4, 2008, which was within ninety days of receipt of her right to sue letter from the U.S. Equal Employment Opportunity Commission (EEOC).

Ryals became employed with AA in 1995. In January of 2001, she became a junior aircraft mechanic at Alliance-Fort Worth (AFW), and at the time of her lawsuit was working as an Aviation Maintenance Technician (AMT). Ryals alleged that, beginning in January of 2004, she had been harassed and discriminated against by her supervisors and coworkers on the basis of her Ethiopian origin, black race and female gender in violation of Title VII of the Civil Rights Act, 42 U.S.C. §2000e, et seq., and 42 U.S.C. § 1981. Ryals alleged that she had been: given the most undesirable job assignments, including cleaning the toilets; ostracized; subjected to unwarranted constant scrutiny; denied overtime opportunities; threatened with unwarranted disciplinary action; subjected to racial slurs and ridicule; and physically assaulted on at least two occasions, suffering serious bodily injury. Ryals alleged that, as a result of AA's actions, she had suffered financial damages, extreme emotional and mental distress, fear of the workplace, humiliation, and loss of enjoyment of life.

On March 15, 2010, AA filed a motion for summary judgment asserting that there was no evidence creating a genuine issue of material fact in support of Ryals' claims and that AA was entitled to judgment as a matter of law. AA alleged that Ryals' complaint was based on petty slights involving Ryals not always getting the assignments she preferred and coworkers being mean. AA further alleged that the physical assaults Ryals complained of were actually workplace injuries for which she received workers' compensation benefits. Also, based on evidence presented by AA, Ryals received more overtime than 12 of the 14 people she identified as being treated more favorably and nearly as much as the remaining two. Further, AA asserted that Ryals had never been disciplined, demoted, transferred, denied a leave of absence, or suffered a pay cut. As a

No. 10-11035

result, AA argued that Ryals had failed to present evidence of any discrimination, retaliation or economic damages and that her claims were barred by limitations because she waited too long to assert them.

On September 13, 2010, the district court granted AA's motion for summary judgment, finding that Ryals had not offered sufficient proof to create a genuine issue of material fact. The district court further found that Ryals failed to show that any alleged events occurring prior to May 31, 2006, were part of a common scheme or related for purposes of the continuing-violation doctrine.

AA moved to strike Ryals' entire summary judgment appendix because she failed to specify which portions supported her claims. Ryals' also moved to strike AA's summary judgment evidence. Ryals' counsel conceded that some of the documents in her response appendix were not properly authenticated and some of the evidence was hearsay. Counsel also indicated that the death of her husband led to her non-compliance with local rules regarding sequential page numbering. The district court granted AA's motion to strike in part and denied Ryals' motion to strike.

Subsequently, Ryals filed this appeal. The EEOC filed an Amicus brief in support of Ryals in relation to the general standards applied by the district court, but without taking a position on the other issues in this case.

## STANDARD OF REVIEW

This court reviews de novo a district court's decision to grant summary judgment when there is no genuine issue of material fact and the moving party is entitled to a judgment as a matter of law. *Stewart v. Miss. Transp. Comm'n*, 586 F.3d 321, 327 (5th Cir. 2009). This court will affirm the district court's decision if it finds that no genuine issue of material fact remained for trial and that judgment was proper as a matter of law. *Id. See also Celotex Corp. v. Catrett*, 477 U.S. 317, 322, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986)); and Fed. R. Civ. P. 56(c).

No. 10-11035

## DISCUSSION[1]

**I. Whether the district court erred in denying the application of the continuing violation doctrine, thus excluding acts that occurred more than 300 days before Appellant's initial complaint to the EEOC?**

**II. Whether the admissible evidence establishes a genuine issue of material fact from which a jury could conclude that Appellant suffered a violation of the law?[2]**

Ryals filed a claim with the Texas Workforce Commission on March 27, 2007. On that same date, Ryals filed a claim with the EEOC. Therefore, based on the applicable statutory 300-day limitations period, the district court found that Ryals may seek to recover under Title VII for conduct that occurred after May 31, 2006. *See* 42 U.S.C. § 2000e-5(e)(1).

Ryals asserts that her hostile work environment claim is not limited to filing suit only on events that fall within the statutory time period under the continuing violation doctrine. Ryals cites *Stewart* as authority. In *Stewart*, this court said:

> A hostile work environment exists "when the workplace is permeated with discriminatory intimidation, ridicule, and insult, that is sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment." *National R.R. Passenger Corp. v. Morgan*, 536 U.S. 101, 116, 122 S.Ct. 2061, 2074, 153 L.Ed.2d 106 (2002). . . . Unlike in a case alleging discrete violations, a hostile environment plaintiff is not limited to filing suit on events that fall within this statutory time period because her claim "is comprised of a series of separate acts

---

[1] As these issues are intertwined, they are combined for discussion herein.

[2] Ryals asserts that the district court erred in finding that her initial March 27, 2007, statement to EEOC would be excluded as hearsay or irrelevant as offered at trial. However, then she asserts that the district court did not actually exclude it and considered it in ruling on the merits of the summary judgment motion. Ryals' point with this is unclear, but the issue of whether the evidence establishes a genuine issue of material fact is discussed herein. It is also discussed herein pursuant to the EEOC amicus brief.

No. 10-11035

that collectively constitute one 'unlawful employment practice.'" *Id*. at 115, 122 S.Ct. 2061.

*Stewart*, 586 F.3d at 328.

However, this continuing violation doctrine is limited as follows:

First, the plaintiff must demonstrate that the "separate acts" are related, or else there is no single violation that encompasses the earlier acts. Second, the violation must be continuing; intervening action by the employer, among other things, will sever the acts that preceded it from those subsequent to it, precluding liability for preceding acts outside the filing window. Third, the continuing violation doctrine is tempered by the court's equitable powers, which must be exercised to "honor Title VII's remedial purpose 'without negating the particular purpose of the filing requirement.'"

*Id*. (Internal citations omitted).

The district court found that Ryals failed to provide evidence that there was a continuing violation. Citing *Forsyth v. Barr*, 19 F.3d 1527, 1537 (5th Cir. 1994), the district court found that Ryals failed in her duty to "identify the specific portions of her summary evidence and to articulate the precise manner in which that evidence creates a genuine issue of fact on AA's limitations defense and her ability to recover on her hostile-work-environment claim under a continuing-violation theory." (Internal marks omitted). The district court's specific analysis bears repeating here:

In her response, Ryals states that "[t]he acts are related and continuing because . . . she was systematically segregated from her white, male co-workers . . . endured daily threats, both direct and indirect, to her safety and well being[,] repeatedly has been assigned to do jobs alone . . .[,] was purposefully assigned tasks that could not be completed by one person in one shift[,] was repeatedly and unjustifiably singled out for blame[, and was] deprive[d] of the same learning experience[s] that her white, male [coworkers] enjoyed." Ryals further insists that her coworkers refused or avoided working with her, and that she was subjected to "virtually constant" mockery and ridicule. But Ryals does not cite a single piece of evidence to support these conclusory and largely legalistic claims. Nor does she

5

No. 10-11035

provide any legal analysis of whether these claims, even taken as true, would be sufficient to show a continuing violation. Specifically, she does not explain how these contentions show that the events prior to May 31, 2006, are related to those occurring after this date.

Instead, Ryals refers to the factual statement made at the beginning of her brief, making the blanket assertion that her claims are supported by that factual statement. That factual statement is nineteen-pages long and replete with deficient citations to a large appendix that does not comply with the local rules and in which exhibits are not identified. "A litigant's failure to provide legal or factual analysis results in waiver" of the related claim or argument. Based on the foregoing shortcomings alone, summary judgment in favor of AA on its limitations defense and on the applicability of the continuing-violation doctrine is appropriate.

*Even considering the facts recited* in the factual statement of Ryals's response brief, there is no genuine issue on AA's Title VII limitations defense or her continuing-violation theory.

Order Granting Defendant's Motion for Summary Judgment, Granting Defendant's Motion to Strike in Part, and Denying Plaintiff's Motion to Strike, 4:08-CV-460-Y at 13, 14 (Sept. 13, 2010) (Internal citations omitted and emphasis added).

In Ryals' brief on appeal, she has expanded her statement of facts to more than thirty-seven pages of conclusory and often contradictory claims unsupported by the record in this matter. Ryals claims numerous unsupported instances of discrimination, but Ryals fails to prove any specific instances of discrimination based on gender, race or national origin. Further, although some of the evidence offered by Ryals was properly found to be inadmissible, it is discussed herein because, just as the district court found, even with this evidence summary judgment is required. As summary judgment would be proper under either scenario, any claim regarding the admissibility of the evidence is moot.

No. 10-11035

In a nutshell, Ryals asserts that crew chief Tommy Toon harassed her by interfering with her training, giving her the most undesirable jobs, making false statements about her performance, and threatening her. However, she fails to provide any proof of this other than her own conclusory statements, which fail to establish any discrimination based on gender, race or national origin. Ryals claims that she was given undesirable jobs related to "lavatory, toilets and cleaning." Yet, the record indicates, and Ryals conceded at oral argument, that all mechanics performed these duties and she also speaks of her performance of other jobs such as wing greasing, roto-peening, engine work, chair removal, etc. She claims that, in response to her reporting the harassment, Toon attempted to run her over with a cart. However, the record indicates that Ryals had previously stated that the person she claims attempted to run her over was actually someone named Gary Dant. The first time Ryals apparently made this claim against Toon was on appeal.

She makes numerous other claims of discrimination by various other people, some of whom she attempts to relate back to Toon. She also claims that she was ostracized by her coworkers and that they did not want to work with her because of Toon. These claims are not supported by the record. Further, the record, which includes statements from various coworkers, indicates that any possible ostracization was directly attributable to Ryals and her behavior toward others.

Ryals claims that she was discriminated against because she was denied the opportunity to advance and/or take certain tests. The record indicates that Ryals repeatedly failed certain tests and never even took others necessary for advancement. Further, the record indicates Ryals' mechanical skills were lacking and that it often took her longer than it should have to complete assignments.

7

No. 10-11035

Ryals claims that she was discriminated against for failing to be allowed to work overtime on one occasion. However, as stated previously, AA offered evidence that Ryals received more overtime than 12 of the 14 people she identified as being treated more favorably and nearly as much as the remaining two.

In her EEOC submission, Ryals made a general assertion that, "[b]eginning in January 2004, I began working under a Crew Chief named Tommy Toon.[3] Mr. Toon routinely provided me with the most undesirable job assignments, including work related to the lavatory, toilets, and cleaning." However, Ryals made no specific claim of any harassment based on gender, race or national origin during this period. She then stated, "[b]eginning in February 28, 2005, I began working under Crew Chief Tommy Toon again. He continuously treated me in a discriminatory fashion, including: unfavorable assignments, monitoring my work closely as a means of harassment, and denying overtime resulting in lost wages, and recommending disciplinary action against me without cause."[4]

Ryals then indicated that on January 23, 2006, she received notice of a shift rotation in which she would again be working under Toon. Ryals said that she advised Supervisor Tammy Lance that such a change would be a "nightmare" and that Lance authorized a change of shift for her. Notwithstanding that Ryals failed to even assert any instances of discrimination based on gender, race or national origin prior to January 23, 2006, if she had, this intervening action by Lance would "sever the acts that preceded it from

---

[3] Yet, in a May 7, 2006, complaint to the HR Department, Ryals said, "I have been dealing with this individual for approximately five years and it has continuously gotten worse."

[4] In her deposition, Ryals claimed that she had been discriminated against at AA since 1996.

No. 10-11035

those subsequent to it, precluding liability for preceding acts outside the filing window." *Stewart*, 586 F.3d at 328, 329.

Ryals said that then, in January of 2006, she began having difficulty with a white, male coworker named Terry Buckler[5], "who had previously told me that my [white] husband should not have married me because I am black."[6] Ryals failed to provide the date, time or context of this alleged statement. Ryals asserts that her trouble with Buckler included him making "hostile, but non-racial, comments about her" and a "farting incident." Again, Ryals failed to provide the date, time or context of Buckler's alleged statements, but she said the "farting incident" occurred on March 21, 2006, in the break room. She claimed that Buckler "came up to me in the break room, stuck his buttocks in my face and farted." In a letter to the union on June 1, 2006, Ryals said that she told Buckler's father, who apparently also worked for AA, of the "farting incident." She also said in the letter that Buckler was "very scarred [sic]" that she was going to take him to HR, and that coworkers began to make fun of him, "saying his father grounded him." Ryals said that Buckler told others that she was going to take him to HR and, as a result, "[w]hen I went to first shift on March 27, 2006, that ruined my reputation and most of the guys did not want to work with me. Some of them asked me, why did you not take him to HR? If he 'farted on me, I would take him to HR.'" Her claim that Buckler ruined her reputation by telling others she was going to take him to HR is contradicted by her statement that others asked why she did not take him to HR. It certainly appears that she attempted to ruin his reputation by discussing the "farting incident" with Buckler's father and others, who in turn made fun of him. Further, Ryals fails to assert or establish that Buckler "farted" on her because

---

[5] He is referred to as Terry Butler in Ryals' deposition.

[6] Ryals said that the slurs she heard were this alleged statement and then one time when she overheard Gary Dant call her a "bitch."

9

No. 10-11035

of her gender, race or national origin.  Finally, Ryals fails to establish how her claims regarding Buckler are related to any other claims discussed herein.

Ryals asserts that on April 27, 2006, she was assigned "dangerous roto-peen work" by Toon and suffered injury as a result.

In her EEOC submission, Ryals said:

> On April 27, 2006, the harassment from Crew Chief Tommy Toon reached a new height.  My performance of assigned roto-peen work was sabotaged by what could only be the deliberate disruption of the power source.  The additional work required was exhausting and enormously frustrating.  When the rest of my shift was going home, I advised Crew Chief Toon that all that remained was some touch up work.  He insisted that I return to the site and complete the job alone.  Due to my exhaustion, and the proximity of one's face to the machine I was using, the rotating part of the machine grabbed and ripped out a large chunk of hair off my scalp.  I screamed loudly, but nobody (including Mr. Toon) came to my assistance.  Despite my injury, I asked the Quality Assurance (QA) representative John Grutznacher [sic] to confirm that my work had been properly completed.  He said it was good and expressed his concern for my injury.  I signed the paperwork and went home.

Ryals also indicated that she did not go to the doctor  for this injury from the hand-held roto-peen until May 10, 2006.

In her letter to the union on June 1, 2006, Ryals said that she was assigned the roto-peen job by a crew chief named Ron Riley, not Toon as she alleges in her brief.[7]  Further, in the letter, Ryals said the following occurred after she completed the job:

> Then I went to get a QA (Quality Acceptance) at 3:30.  The QA looked at it and said that the inboard and outboard was done.  However, he wanted me to do a little touch-up to the link face.  At that time, (since it was 3:30), Alfredo [Melendez, who had assisted as a timer at times on the job] and the other first-shift employees left the dock to prepare for going home, and usually second shift is suppose to take over at 3:30.

---

[7] Ryals also said in her deposition that Riley assigned the job.

10

No. 10-11035

Since I was exhausted and shift change had began, I went and brought the second-shift Crew Chief, Tommy Toon, to my work area and told him that the inboard and outboard was completed, but that the link face required a little touch up. Then I asked him to explain to QA. Tommy Toon said "So what, if it needs to be done, you have to do it." I was trying to tell him that it was time to go home, so I asked him what time it is, and he looked at his watch and said you have fourteen minutes, finish it. When he said that, Mr. John Grutzmacher the QA was still there.

This upset me especially since he knew about all of the power problems that I encountered (preventing me from finishing the job) and since second shift was already there, (sitting down at that time). Therefore, I started the machine, and continued working. I was trying to concentrate while touching up the link-face, which requires you to get your face very close to the unit. Upon completion (at 3:55), I reached to turn off the motor and as I stretched for it with my left hand, and since I was stressed and exhausted, my right hand came closer to my face, and the rotating part grabbed and ripped out a large chunk of my hair off my scalp.

This was very painful and I screamed very loud; and nobody (including the crew chief) came to see if I was OK. Then I asked the QA about the job, and he said that it was good. Then he said I am worried about the accident, and that he had never seen one like this, and I tried to cover up my head, and he helped me. I asked him not to tell anybody, because I did not want the guys to make fun of me. Then I signed the paperwork, and all I wanted was to hide my injury, and leave. Since it was past 4:00, I put up my tools, check in the roto-peen machine to the tool room, and left.

In her deposition, Ryals gave a different account:

I was very stressed and very upset, I'm – he just told me to do the job and all I want to do is do the touch-up and go, but I can't concentrate and I was shaking and I went up holding with – with this hand and then trying to do that, the job, and then it will fall on me, it was right – from the wing it kept coming to me, the machine. So I tried to stop it and I got it in my hair.

Ryals also indicated that her long hair was in a ponytail the day of the accident. She said it was "discriminatory, retaliatory" because Toon should have let her

leave a few minutes early to go home and should have made someone else finish the touch up. She also said that she considered the roto-peen incident to be a physical assault because, "I was emotionally very stressed out and I shouldn't have been doing that job, I should go home."

Ryals was assigned this job just after 10:30 a.m., but did not start on it until after both her 11 a.m. lunch and 1 p.m. break. The record indicates that there were some power issues after she had started working on the job. Ryals attempted to blame this on someone intentionally cutting off the power, however, such an allegation is absolutely not supported by the record.

Ryals also said in her letter to the union that she did not ask to do the roto-peen job, but that "three weeks ago Alfredo suggested to me that the guys said that you were not working and if you want to get them off your back, you need to do the roto-peen." However, in her deposition, Ryals unequivocally said she asked for the roto-peen job. In fact, Ryals said, "[y]eah, I had to fight for that to do that. . . ."

Grutzmacher said that he was standing by Ryals as she performed the touch-up, but had his back to her. He also said he was unable to approve the job because it still needed additional work. Further, "[b]ased on my experience, Roto Peen work is usually a one-person job because the machine is hand-held. On the day that Ms. Ryals was injured, I had no reason to believe that the job she was doing could not be handled by one person."

Another "assault" that Ryals complains of involved an incident on October 3, 2006, when someone opened a closed access hatch as she stepped on top of it while carrying something. Ryals claims in her brief that:

> During the event, Ryals could see co-worker Mr. Jim Coultes, who is a good friend of supervisor Toon and would frequently target her with angry looks, just standing there watching her. Despite being in position to know that Ryals' [sic] was approaching the hatch carrying heavy gear, Mr. Coultes opened the hatch knowing that

Ryals' [sic] would be on top of it. Mr. Coultes admits to opening the hatch, but claims he could not see Ryals. Ryals' [sic] asked Coultes why he had done so, and he refused to answer. As a result, Ms. Ryals was severely injured and suffered a concussion, fractured shoulder, a deep cut to her left leg, and other injuries. Ms. Ryals was unconscious for several minutes. Despite knowing that she was badly injured, Coultes failed or refused to provide any aid and just walked away from the scene despite supervisor Jerry Smith asking for witnesses.

(Internal citations omitted). However, in her deposition, Ryals described her injuries as follows:

So I noticed when I step on the latch, I feel the lift. And after that I passed out for two minutes, because they told me I fell, my head hit the lavatory, the first lavatory, and then since I was carrying those two metals my hand got pulled, my hand hurt, which I was very lucky it didn't go to my face. And then since he just opened it, the latch opened and then he closed it back, I had a cut on my leg.

Ryals also said she did not know whether Coultes looked through the hole. Further, she filed a workers' compensation claim and received benefits for approximately three or four months, but was out of work for a year.

In her submission to the EEOC, Ryals said, "Mr. Coultes made no effort to assist me as I lay unconscious, confirming his malice; I asked him why he opened the hatch and he made no reply." It would appear that if Ryals was unconscious, she could neither observe Coultes' efforts to assist her nor ask him why he opened the hatch. In his statement, Coultes indicated that he did not see Ryals, attempted to open the hatch carefully, and went to her aid after she fell.

Ryals claims the third "assault" occurred on April 28, 2008, shortly after she returned to work from her previous injury. She was lying down and working under a seat when a coworker, Robert "Boomer" Walvoord, walking down the aisle stepped on her leg and injured her knee. Ryals said she believed Walvoord stepped on her intentionally because he is a friend of Toon and "the thing is

really, and he didn't turn around and say, 'oh, sorry,' or anything else, he just sneak out. If you make a mistake, you turn around and you apologize." However, in a May 18, 2008, statement, Ryals said, as soon as Walvoord stepped on her knee, "[l]oudly I said, because I was in pain, Boomer (nickname) you just stepped on my knee and you are just leaving. Everybody heard what I said. He turned around, I apologize, I apologize, and he left."

The Injury on Duty Report completed by Supervisor Richard Bullard said:

> After the accident I went into the first class area to look at the area on the plane. I noticed that the area where the employee was working was highly cluddered [sic] with air hoses and with a huge air conditioning hose. Where the employee was working it would have been easy for another person to miss seeing someone stretched out on the floor half working under a seat. Boomer stated that he did not see her and thought he was standing on the a/c hose when it was actually the employee's knee. Boomer is a large man about 5-10 and 260 pounds. I believe that the action was a mistake on Boomer's part and not done on purpose.

In his statement, Walvoord said, ""I was trying to see some co-workers at the other end of the aircraft that I was coordinating with on a job assignment. In doing so, I stepped into the aisle and accidentally stepped on Tigist Ryals' knee." Walvoord said that the aircraft was cluttered and he did not see Ryals, but, once he realized he had stepped on her, he apologized. He further said, "I did not intentionally step on Ms. Ryals, nor did I intend to injure her."

Ryals has failed to establish a hostile work environment in that she has not shown that AA is "permeated with 'discriminatory intimidation, ridicule, and insult,' that is 'sufficiently severe or pervasive to alter the conditions" of her employment and "create an abusive working environment." *National R.R. Passenger Corp. v. Morgan*, 536 U.S. 101, 116, 122 S.Ct. 2061, 2074, 153 L.Ed.2d 106 (2002). Further, Ryals has not established a continuing violation by showing

that the separate acts of which she complains are related. *Stewart*, 586 F.3d 321. Instead, Ryals offers only her own conclusory statements.

Ryals' reliance on *Huckaby v. Moore*, 142 F.3d 233 (5th Cir. 1998) is misplaced. Huckaby was continually subjected to racial harassment. *Id.* at 239. Huckaby consistently indicated, in both his affidavit and his deposition, that he was "constantly ribbed and harassed for being white." *Id.* at 240. Additionally, Huckaby was required by his African-American supervisor to attend a meeting that black employees were not required to attend and he was assigned to stand in the rain while other employees were not. *Id.* Ryals offers no evidence of any constant harassment of any sort. Instead, she offers only contradictory and "vague or conclusory allegations of discrimination or harassment" which "are not enough to survive summary judgment." *Id.* at 241.

*Brief of the EEOC as Amicus Curiae in Support of Plaintiff-Appellant*

The EEOC's brief indicates that its factual recitation is based on Ryals declaration, including the March 27, 2007, statement, and co-worker Elizabeth Dracon's[8] declaration. Further the EEOC believes the district court erred in excluding Ryals' attachment as inadmissible hearsay. However, as stated previously, Ryals is of the opinion that the district court considered the statement. She is correct. The district court said:

> AA objects to Ryals's letter to the EEOC as hearsay. Ryals responds that the letters are not offered for the truth of the matter asserted, but are instead offered to prove the facts of which AA was aware. But the letter is to the EEOC, not to AA, and Ryals cites the letter in support of her factual assertions regarding the incident. In any event, the Court discusses this evidence only to show that Ryals has failed to specify evidence creating a fact issue on AA's limitations defense and that, even if the Court parses through Ryals's evidence on its own, there is no issue of fact on the defense or her continuing-violation theory. Were Ryals to offer this evidence at trial to prove

---

[8] Dracon's statement also established some of the offensive nicknames used for Ryals' various coworkers, i.e., "Box of Rocks" and "Hitler."

the facts of her claims, it would be excluded as hearsay; if offered to prove the facts of which AA was aware, it would be excluded as irrelevant.

Order Granting Defendant's Motion for Summary Judgment, Granting Defendant's Motion to Strike in Part, and Denying Plaintiff's Motion to Strike, 4:08-CV-460-Y at 15, n. 1 (Sept. 13, 2010).

The EEOC correctly asserts the applicable law. However, we disagree with the assertion that the district court applied incorrect legal standards in excluding evidence of acts of harassment attested to by the plaintiff in considering the defendant's motion for summary judgment. As set out throughout the summary judgment order, the district court clearly did consider all of the evidence, even that which ultimately may have been excluded.

## CONCLUSION

The record in this matter establishes that no genuine issue of material fact remained for trial and that judgment was proper as a matter of law. Therefore, we AFFIRM the district court's grant of summary judgment for American Airlines.